Jesse Wilkinson v. Appellant Darrell Griffin I've reserved five minutes for rebuttal. The issue in this case is whether the district court erred in granting summary judgment on behalf of the defendants on Griffin's race discrimination claims arising out of his demotion from a position that paid him an additional $36,000 per year. The reason that the city gave for his demotion was that he as an affordable housing coordinator was charged with soliciting bids from developers to provide rehabilitation to blighted areas within the city. What Griffin did is what was referred to as self-performance within the division that he was in. Let me ask you about this. There seems to be some disagreement about what self-performance is and that sort of thing. Is it self-performance if the developer gets paid and then developer bids out work to an outside contractor and charges the government for that? No, that would be the way that things were done under the city's procurement code. What self-performance was is if the city bids out to a developer and then that developer either uses its own employees as a contractor or hires a contractor in which its employees are principals. I thought the audit found that what Griffin had allowed to happen was for developers to bid out work and self-dealt. In other words, had officials of the developer who were also, at least in one instance, were officers and interested in the winning bidder who knew of all the bids coming in from other would-be contractors and therefore had a huge advantage to the disadvantage of the city. That's not self-performance. That may be self-dealing, but that's not self-performance, is it? It's self-performance in the way that it was used within the division because the developer itself is soliciting from the city. The developer submits an application that says, we're going to get this done for $50,000. Then what it does is among the bids, in Griffin's case, that the developer would take, it would take a bid from itself saying, we can do the work for this amount. That amount. Give me an example. If they say, we can do the plumbing for $5,000, let's say, and then they're the winning bid on that, then the developer and the contractor would be the same person. Both of these entities are outside of the city. They're both third party, and neither of those individuals are associated with Griffin. If they don't disclose to the city, the developer doesn't disclose to the city, oh, by the way, I'm the one who's doing it for $5,000. No, they do disclose to the city. In Griffin's deposition, what he testified to is that he prepares a summation of what the contract is going to entail. That summation includes the proposal from the developer as well as the contractor. But he doesn't disclose, oh, by the way, we're self-dealing. I have an interest in that outside contractor. In one of the contracts, the developer and contractor were literally the same person, and in the other contract, it was another construction company called Dvorak, which the division chief knew was ran by a principal of the developer. In both instances, they knew that it was the same person. You can't call it self-performance if it's an outside entity doing it. That's not ... Self-performance is when the developer says, I can get this done for half a million dollars. I'm going to do it all myself. Y'all just paid me half a million dollars, and the city says fine. I mean, you can do that under the procurement code. That's self-performance. But when you say, oh, I'll put them out for bid, so we'll get the low bid, and you won't have to pay any extra, and as it turns out, one of the bidders is one of the developer officials and knows what everybody else's bid is, you can't say that's ethically appropriate or is in the best interest of the city or is self-performance. Well, in the earlier situation that you referenced, the developer is not even taking bids, so they can just say, I'm going to do it for this amount of money. At least in the latter case, they're soliciting ... They can be beat by other bids, and so there is a greater element of competition within ... I thought when presented with the allegations of what he had allegedly allowed to be done, Griffin acknowledged that it was wrong and had no defense to it. What Griffin acknowledged when he was presented with it, and this was a meeting with the council auditor before the draft audit findings were finalized or presented to him, and the council the same person, and what Mr. Griffin replied rather nonchalantly was, that's right, we don't do that that way anymore, and the reason he gave that reply is because the widespread practice and even the guidelines that were referred to within other programs, even what his predecessor had done, had allowed this to happen. It was seen as a more efficient means of getting bids to complete these projects. He did not dispute the fact that it violated the city's procurement code and the contracts themselves, did he? He did not dispute that he violated the letter of those contracts, but what he disputed was that he violated the procedures within the housing division himself, that basically the contracts that they had been and what he was taught to do was not ... Overseeing position, wasn't it? Well, that's true, but given the policies that were coming from above him, they said that this is the way that things were going to be done, the training materials said it, the applications used the terminology in the way that Griffin did because they didn't say solicit the bids, they said solicit the bid. Your position, his position is he did nothing wrong. He did not violate any policies within his department. Let me ... I have the same problem Judge Carnes apparently does. I haven't looked at the entire record myself, but my law clerk has and he has not found anywhere in anything that's referred to where the alleged self-performance practice actually involved conflicts of interest where, as the auditors found, the developer had somebody or the contractor, let's say, had somebody who was awarding, had an inside person in the entity that was awarding the contracts and judging the bids so that this was inside knowledge as to what the other bids were creating an obvious conflict of interest. Where in the record will we find that that kind of conflict of interest was widespread practice? You'll find it in Mr. Griffin's deposition testimony and his interrogatory responses as well as in Mr. Gaston, who was the principal of Wealth Watchers, said that this practice was ongoing. The division chief knew about it and, you know ... All of these, you're saying, pinpoint actual conflicts of interest like this inside person in the entity awarding bids. You got any page numbers for me? In Mr. Griffin's testimony and in his interrogatory responses, which is document 25-2, he has a lengthy response that lays it out, how it was done within the department. I do not have the site for Mr. Gaston's testimony, but what he essentially testified to was that the division chief knew that I was the principal of both of these companies. This was done all the time. Everyone knew about it. Even holding aside whether this violated conflict of interest rules or not, a race discrimination can still be made out. We still contend that the conflict of interest and bidding irregularities on the side of our comparators, who are Ms. Stewart and Mr. Pappas, are more severe than Mr. Griffin's. He was not, and they were not, disciplined or had any adverse employment consequences. You didn't proffer Pappas to the district court, did you, as a comparator? We did. In the procedural history? In our summary judgment pleadings. The same argument, and Pappas is a little bit less on point because he was the only one who issued the extension of the IGS contract. The person who is most on all fours with Mr. Griffin is Ms. Stewart because she was the one that requested the contract in the first instance and was the one that bypassed the full source requirement, essentially requiring no other bids to determine who the city would award that contract to. Isn't your argument weakened by the fact that she sat on a committee of five? It says a committee of five, but if you look at the face of the audit itself, this is how it went down. Within that committee, there was a subcommittee, and that subcommittee consisted of Ms. Stewart and her deputy director within the division. They were the ones who would actually solicit and score the requests for proposals, and then they would present that to the three other members of the subcommittee as a whole. In fact, the audit found that the committee did not have a requisite amount of oversight over these and actually recommended, hey, you need to be more involved. These other three people need to be more involved in requesting, involved in the bidding process. What the city said is we're not going to follow that. The subcommittee has expertise. Really Ms. Stewart was in the same position that Mr. Griffin was. She was the one requesting the contract. She was the one who scored the bids, even though in this case there was only one bid, and she was the one that ultimately had to get approval from one other person, just like Griffin did with his division chief, just like he had to do with the city's financial services department. I'm out of time. You've had such a hot bench this morning. I had a couple other questions before we sat down, if that's all right. I noticed you haven't mentioned Ms. Greger. She wasn't there when the findings of the audit 779 came out. That's the problem with her. She wasn't employed by the city at the time that the findings came back, so the city couldn't take an adverse action against her. Okay. That's what I thought. Thank you for that. About Ms. Stagner, my understanding of the cat's paw liability is that the person you're seeking to hold liable under that theory has to have made a recommendation. I don't see where she did. Am I missing that in the record? Mr. Moose's deposition testimony, he said that he delegated to Ms. Stagner preparing responses to the audit. One of the questions in the audit said that you should consider imposing discipline. What Ms. Stagner put in that response is that, yes, we will pursue discipline against this employee. She never recommended his dismissal, did she? She didn't recommend his dismissal, but that was, as an appointed employee, really the action that the city was considering taking in Griffin's case. She knew, knowing that she had permitted this policy to go on within the city, that withholding that information and making that recommendation, despite knowing that information, that this would be the consequence of her recommendation. I thought the delegation to Stagner excluded the two paragraphs that dealt with suggesting discipline against the plaintiff. Am I wrong? So, Mr. Moose wasn't able to pinpoint who came up with that exact language, but Ms. Stagner was tasked with responding to the entire audit, which dealt with these conflicts of interest in the rental rehabilitation contract, so she had ample opportunity to come forward and say, actually, this was the policy of the department at the time. Griffin did not violate any of our instructions. He did nothing wrong. So that's the basis of the cat's paw theory for her. It's not that she recommended his dismissal, it's that she didn't defend him in the process. That's your theory? Well, and that she was charged with responding to the findings, and she did not come forward with evidence that she knew to be exonerating. Thank you. You can take a breath now. Oh, no, maybe not. I have a question. Sure. In fact, a good, considerable, long question. I don't think Stewart is comparable, similarly situated, for these reasons, and I'd like to hear what you think about this. Number one, the two audits, in plaintiff's audit, there was a direct recommendation of discipline. In hers, there was not. And also, no suggestion of conflict of interest as to her or to any particular person in the audit with respect to Stewart. Second, both of these audits were public, so there was considerable pressure, it seems to me, on the city. The city was obliged to do something about Griffin, it seems to me, because of that public. Third, Stewart's situation is different because, for example, there would be no taint or smell about what she did at all unless there was some kind of prearrangement between her and this consulting company, IGS, I think it was. And my clerk has found no suggestion of coziness or so forth between her and the grantee, IGS. For example, the grantee could simply have been impressed with her during this process and say, we want her on our side. So the absolute most that Moosa could have done with respect to her is, and by the time of this audit, she was the chief of staff to the mayor himself. And it seems to me the most he could have done was to tell the mayor, look, she, soon after this grant that she started, some months ago, actually, or years, because what she had to do with it was early on, she took a job as vice president with this grantee. But actually, he didn't need to tell the chief, the mayor that because the mayor actually hired her from IGS. So he knew that history already. So it seems to me, I know Rank is not supposed to participate in this, but he just, as a he's not going to do anything except tell the mayor about this. This is the mayor's personal chief of staff. Doesn't that make her very different? So, attorney, your last point on that first. Under the McDonnell-Douglas framework, it's the employer's burden of at least, not persuasion, but production to come up with a neutral explanation for what they did. And had Mr. Moosa said, oh, well, I didn't want to terminate her because she was a higher ranking official, and I didn't want to make the mayor angry, that would be one thing. But that wasn't the explanation that he gave. The explanation that he gave was that she was not a, quote, day-to-day manager of the contract, even though she was the very person who requested the contract, and she was the recipient of the services in those contracts. To Judge Anderson's point regarding the kind of smell or taint of a conflict of interest, you have to keep in mind that in Griffin's case, he didn't have any kind of conflict of interest, personally. The conflict, to the extent there was one, would have been between the developer and the construction company, and he was one in a long line of people who were checking those boxes and seeing if, you know, they complied with the rules. Furthermore... I thought he had the principal responsibility for ensuring that they did comply with the procurement code and other rules. Well, what his responsibility was, was to take the proposals, check them over, and prepare a case plan or summary of what everything entailed, and part of that would have been checking the rules. Whether there was anything that was being violated, and he was to report that up, right? Correct. But he was checked by the city finance department. He was checked by his division chief. Whoever checked him, he was the man on the ground, the principal responsibility, the first cut, whatever you want to call it. It was his responsibility to report that. This is a violation of the code. This is a violation of the rule. And just as it was Ms. Stewart's responsibility in securing this contract to make sure that she was complying with the city's ordinance relating to sole source purchases, which the audit found that she didn't, both of these individuals had responsibilities to make sure... He violated the rules of the code as to one project. He did it as to what? Four. Well, there were four out of nine. It was especially egregious, but there were four times where there were irregularities. I'm sorry, there were five other times where there were irregularities, weren't there? Well, so what they said is that we looked at nine contracts, four of them had this self-performance issue, which was the reason for the recommendation. You're right. You're right. But to your point, Judge Carnes, is that the contracts and the stakes regarding the IGS contract far exceeded in terms of dollars and cents. And what the audit also found is that in that contract, the city got no tangible product out of them for those... The city's compelled to consider matters of discipline or matters of malfeasance, not the number of times the employee has failed, but the dollar amount of all failures. Well, the question that we're asked is when does this become a jury issue? And I think a really good point of comparison is the Barub case out of the Second Circuit where you had multiple record-keeping deficiencies. One person had a couple deficiencies that over time accounted for $15,000. One person kind of shared the blame, but their total impact was $95,000. And what the court said is that these are comparable enough that a jury could find that one was more egregious. And that's the same thing. We're not talking apples and oranges. We're talking about apples and apples, really. All right. What we're talking about is we've let you run nine and a half minutes over. So we will go now to Mr. Fizer. Thank you. And Mr. Fizer, if we take up some of your time, we give you a few extra moments, too. Thank you very much, Your Honor. It may please the court. Craig Fizer on behalf of the city of Jacksonville and Ms. Stagner. I want to go right back to the first question that was asked by Chief Judge Carnes because it really hits the nail on the head. Judge Carnes was asking about what was found in the audit that's at issue here that made findings concerning the appellant. And what the audit found was conflicts of interest. Not self-performance, but self-dealing. And if you look at the testimony of the actual independent city auditor here, Mr. Sherman, he really explains both audits very, very well. He actually called what he found in that first audit, number 769, self-dealing. It is a developer contracting with the city, taking bids from contractors, one of which it has an interest in, and saying, I'm going to pick that one. That is a conflict of interest. That is self-dealing. The difference between that and the later audit, number 779, is that is a different program, for one. It's a neighborhood stabilization program, which is completely different. It's a consulting contract, and as was pointed out, it's bid out, it's in an open process, it's in the sunshine. And even if you can say self-performance in that program, which is completely different, might be allowed, they're sealed bids. So nobody knows what's coming. The bids are selected through that open process and a sealed process, and then the actual contractor is selected. That is a different circumstance. So even if there is evidence in the record that self-performance wasn't accepted policy, it certainly wasn't in the rental rehabilitation program for obvious reasons. It's a conflict of interest. So the audits are just completely different, and anyone involved in both audits are completely different. The first audit made findings specifically that within the rental rehabilitation program, which is taking ship monies, there were conflicts of interest in four contracts, there were procurement violations in another five contracts, and as the auditor put it, serious, egregious stuff. Mr. Moussa put it, this is a rare audit, I've never seen something like this where it actually points the finger really directly at somebody. The second audit didn't make any kind of findings of any violations of any individual because, again, the auditor explains this very well. I was auditing a process. I'm auditing a contract and the process for approval of this contract and how it was handled by this overall program. I wasn't tasked with and did not point the finger at any one individual. Keep in mind, even if that was wrong, the findings of that audit didn't have any violations by Ms. Stewart or anyone else. And the evidence is absolutely uncontradicted that Mr. Moussa, the chief administrative officer of the city, relied on both audits in making the decisions, whatever decisions he made. He relied on the first audit in deciding, I need to do something about this. I have the program manager for the rental rehabilitation program, a program that handles thousands and thousands of dollars, hundreds of thousands of dollars each year, who's engaged in serious, the auditor's telling me, violations. I'm going to rely on that and I'm going to start an investigation. I'm going to put him on administrative leave and I'm going to start an investigation. There's no evidence at all that that had, and certainly had anything to do with race. That is a completely non-discriminatory reason and perfectly viable reason why he would decide to do what he did. In the second audit, he's got an audit of a contract process. Originally it was a sole source contract, then it became a bid contract. And there were some irregularities and concerns there as well. But it was a concern with the program and the process for this particular contract. He doesn't have any findings that any individual might be at harm here. He certainly has no basis to say, well, even though there's no findings of the independent auditor here that anybody should be investigated or disciplined, I'm going to go ahead and do it anyway. There's no reason for that. He's got an audit that tells him there are concerns. He counsels about them. He figures out a way going forward. He agrees with those findings as well. That's the evidence. It's uncontradicted evidence that in no way can get the appellant anywhere near a race discrimination claim. He has to show a prima facie case, as the district judge said. First of all, he has to show that he's actually had an adverse action against his employment, which he can't show, because there's only two ways he can get to an adverse action here. One is he either has to say that he was demoted, and that's the term they use, demoted. It's not a demotion. What happened was, when the mayor's changed over, he submitted a resignation like all appointed employees always do. If the mayor accepted his, quote, voluntary resignation, end of quote, and didn't accept others, and the reason he accepted the plaintiff was racial discrimination, that would be a violation of the 1981, would it not? I think that conflates the issue. No, it doesn't. It does because that's- It asks a question that concerns me, which is why you should answer. Obviously- It's all these letters, and it's undisputed, as I understood it, that everybody's required to file these letters because they're at-will employees. That emphasizes they're at-will. It gives a paper trail for getting rid of an at-will employee if you want to. If the reason he accepted, scare quotes, accepted this resignation letter and didn't accept any others is that this resignation letter was from a black person, that would be a violation of Section 1981, would it not? Your Honor, first off, yes. You cannot, you can't remove somebody or take an action adverse to their employment for a discriminatory purpose. That's what he's alleged to have done, and it is also, as I understood it, undisputed, that the effect of that was he reverted back to a $30-something thousand less compensation position. Well, yes, and what happened here, Your Honor, is when he submitted his resignation, of course, that's completely separate from the audit at the time it was submitted. That's because the mayor changes over, and the mayor decides I want to put my people in appointed positions, and it happens every time. I would suggest you don't spend too much time on this issue. I'll make it unanimous right now. Okay, yes, Your Honor. But that just gets you approaching the doorway anyway to a racial discrimination claim. You've still got to prove that whatever decision was made, if it's adverse, was because of the plaintiff's race, and that's where the real problem comes in. That's where the audits come in. He's using circumstantial evidence here to show that there was racial discrimination. His circumstantial evidence is I've got people who I claim are comparators that were treated differently than me under the same rules. He doesn't have that, and I think that's already been pointed out. He has people in a completely different audit, higher up, who are upper-level signatories to a contract that was audited, not the actual program, who were not found to engage in any sort of conflicts of interest, were not found to engage in any sort of procurement violations, were not found to have engaged in any sort of wrongdoing whatsoever. And I would point out that Mr. Pappas was brought up, but not until, I believe, the response to the Sermon Judgement motion. There's a constant shifting in this case of the appellant trying to find somebody that he can compare his discipline to, and he just doesn't have any. He has... Ms. Stewart is really the only one that is sort of consistently raised, and she's just nowhere near similar to him in terms of not only her level of position, but also what happened as far as her role in the audit. The audit was a committee process that she was involved in to approve a contract, and then the sort of processing of that contract as it went forward, and there were concerns about that. I thought she initiated the very first one for a smaller amount of money. She was the division chief, and her agency did initiate it, but it was approved by PSEC, which is a committee out in the open in the sunshine. That's the only one that she was involved in directly, is that right? Eventually, as I believe you pointed out, Judge, she was the chief administrative officer to the mayor, but there were renewals of that contract, and that's where all that money comes in, but again, approved by a five-person committee. She did not initiate the renewals, as I understand it. Is that right? They came from her division, and there may have been a time period where she was still the division chief, but it changed over a lot of times. But even if they initiated it, they were reviewed and approved by a committee out in the open, and even if the process proved to be flawed and the city allegedly didn't get the services it was due, the audit didn't find any sort of wrongdoing by any individual, specific individual, and certainly not any wrongdoing that you could compare to Mr. Griffin's audit. And again, keep in mind too, even if all this is incorrect, even if maybe you could argue the appellant didn't do anything wrong or there was some sort of policy that allowed him to do what he did, we would argue vehemently that there isn't. But even if there was, and even if maybe somebody should have been found liable in the later audit, mistakes can happen. That still doesn't show that the ultimate decision-maker here, and there's only one, and it's Mr. Moussa, actually still had a nondiscriminatory reason for making the decision that he did, and the appellant cannot show that not only was that false, but it was actually race that was the reason. There's really basically no evidence even alleged in the record that Mr. Moussa himself had any sort of racist, animus, or bias. The only person that comes close to being alleged to have had any racial bias is Ms. Stagner, and she had nothing to do with anything. She wasn't the decision-maker. It should be pointed out that she said in her deposition that yes, she was tasked with looking at the responses from the city to that earlier audit, number 769, but that the two responses really at issue here, the ones actually agreeing, yes, we need to investigate and possibly discipline Mr. Griffin, came from the mayor's office because that's where the audit was directed to. We, the independent auditors, believe you should do this, and there's no allegation that the independent auditors had any racial bias. They just found these particular serious, egregious violations in this one program administering SHIP funds, and they directed that to the mayor's office. We think you should investigate and possibly discipline him. Mr. Moussa, the ultimate decision-maker here, agreed with that, had nothing, absolutely nothing. There's not a shred of evidence in this record that that had anything to do with the plaintiff's race in this case. It had everything to do with the actual nature of the violation. So there's no prima facie case because there's nobody to compare himself to, which is what he's relying on, and even if he could possibly get by that, there's no evidence that the city's decision here was based whatever decision it was by Mr. Moussa was pretextual, that it was not actually based on the audit, which is what he absolutely says authoritatively, but it was actually based on race. And as far as Ms. Stagner goes, as I said, she was charged with filling out sort of the remaining parts of that audit, but she didn't make any... Did she have anything to do with the two findings with respect to Griffin? According to her testimony, she cut and pasted those into that audit, and she had nothing to do with any actual decision regarding an investigation, regarding whether or not he might be subject to discipline, and regarding what appellant calls a demotion. She wasn't part of those meetings. She wasn't involved in that at all, and Mr. Moussa himself says over and over again, I didn't rely on her at all. I didn't meet with her. I didn't take any recommendations. I'm relying on what my independent auditors are telling me are serious, serious violations. There just is nothing in this record to show any evidence of race discrimination. If there are no further questions, thank you, and we ask that the district court be affirmed. Thank you. All right, Mr. Wilkinson, five minutes. And we're being generous with you on that. I appreciate the court's generosity. I bet you do. Going off of what Mr. Fizer said regarding the two audits that Mr. Moussa was confronted with, one, the audit in Griffin's case didn't say you should impose discipline. It said you should consider whether discipline is appropriate, and the reason for that, and the reason the council auditor seeks input from the division is because they're not the subject matter experts on how the divisions are run. That's supposed to be with the administration and the city. Second, the audit for Ms. Stewart didn't say that she did nothing wrong. What it specifically said was that the purchase order, the one that Ms. Stewart initiated, violated the city ordinance code section 126.31a, and that's the one that requires you, if you want to use this very special sole-source purchase order and have this be a noncompetitive bid, you need to make sure that this is really the only firm that can do it. Not only did she fail to provide that research and those assertions, but in fact, she was wrong. She did misrepresent to the committee that that was the only person that could do it, because when that bid came back, there were six qualifying competitors who said, hey, we can do the same job that you're doing. So in both cases, you have violations of the city's procurement code. In both cases, there is no explicit recommendation for discipline. And in both cases, in each case, there was a different outcome. And all that is from the face of the two audits that Mr. Moussa reviewed and was presented with. Regarding the discussion of the conflicts of interest that Mr. Fizer described as very serious, I think there's been a characterization that is refuted by Mr. Griffin's testimony about how this process worked, that this was a secret, that the people who were reviewing Mr. Griffin's contracts didn't know that the developers were using themselves as a contractor on these audits. The deposition testimony was that everyone knew about it. It was widespread, and that Ms. Stagner, who reviewed the contracts, was in fact familiar with both Mr. Gaston and the company he ran, and both his hat as a developer and his hat as a contractor. So this was not a situation where Mr. Griffin was keeping someone's secrets. It was just the way that it was done and the way he was taught to do things when he came to the position of affordable housing coordinator. The other, regarding pretext and the city's race-neutral justification, another factor here is that typically what Mr. Griffin testified to is that when these audits would come down, the draft responses would be shared with the people who were implicated in the audit so that they could kind of have their piece and say, hey, this is right or this is wrong. What Mr. Griffin was faced with was just a statement from Mr. Carter that, hey, four of your contractors were also developers, and no allegations of misconduct, no finding that he violated any laws. And that opportunity was kept from him, and it was provided to Ms. Stewart. In Mr. Amoosa's deposition testimony, he stated that he provided Ms. Stewart with a copy of the audit before it went public. She had exceptions to that audit, and they had a discussion about it. I think there's a factual inference that could be drawn from this, that by excluding Griffin from this process, which was contrary to the city's normal policy, there was an intention to make this audit clean so that Griffin wouldn't be able to provide the information to the auditor that exonerated him. And from that, the jury could infer a pretextual explanation for Mr. Griffin's termination. Panel has any other questions? We don't. Thank you, counsel. Thank you. We'll take that case under submission, and we'll also take a 10-minute break before we take up Gail versus Jeff. All rise. We'll be right back.